IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

BERNICE PORTIS and          :
JOHN PORTIS,                 :          Case No. 06cv2123
        Plaintiffs,         :
                            :
        v.                  :          (Judge Jones)
                            :
RIVER HOUSE ASSOCIATES, L.P., :
et al.,                      :
        Defendants.         :

## MEMORANDUM AND ORDER

### August 2, 2007

## THE BACKGROUND OF THIS ORDER IS AS FOLLOWS:

Pending before this Court is a Motion to Dismiss Counts IV and V of the

Complaint Pursuant to Federal Rule of Civil Procedure 12(b)(6) ("the Motion"),

filed by all Defendants[1] to this action on April 13, 2007.   (Rec. Doc. 15).  For the

reasons that follow, the Motion will be granted.

## PROCEDURAL HISTORY:

On October 30, 2006, Plaintiffs, John and Bernice Portis ("Mr. and Mrs.

Portis," respectively), initiated this action by filing a Complaint.  (See Rec. Doc. 1).

---

[1] Defendants to this action are River House Associates, L.P., d/b/a Korman Communities, Inc., and Korman Communities; West Rittenhouse Management Co., L.L.C., d/b/a Korman Communities, Inc., and Korman Communities; and Mary Thompson, individually and as an authorized agent of Korman Communities.

On April 13, 2007, Defendants filed the instant Motion.  (Rec. Doc. 15).  As the Motion has been fully briefed, it is ripe for disposition.

**STANDARD OF REVIEW:**[2]

In considering a motion to dismiss, a court must accept the veracity of a plaintiff's allegations.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); see also White v. Napoleon, 897 F.2d 103, 106 (3d Cir. 1990).  In Nami v. Fauver, 82 F.3d 63, 65 (3d Cir. 1996), our Court of Appeals for the Third Circuit added that in considering a motion to dismiss based on a failure to state a claim argument, a court should "not inquire whether the plaintiffs will ultimately prevail, only whether they are entitled to offer evidence to support their claims."  Furthermore, "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957); see also District Council 47 v. Bradley, 795 F.2d 310 (3d Cir. 1986).

**FACTUAL BACKGROUND:**

---

[2] We note that with respect to the standard of review, Plaintiffs assert that "[i]f a complaint is vulnerable to dismissal for failure to state a claim, a District Court must first permit the plaintiff a curative amendment."  (Rec. Doc. 20 at 5 (citing, e.g., Alston v. Parker, 363 F.3d 229, 235 (3d Cir. 2004))). We disagree with any suggestion that upon the filing of Rule 12(b)(6) motions, this Court should sua sponte inform represented plaintiffs of the method(s) by which they can seek to amend their pleadings. Indeed, all three (3) of the cases that Plaintiffs cite in support of any such suggestion, including Alston, are distinguishable because they involved pro se plaintiffs.

As is required by the standard of review applicable to the Motion, the following recitation of the facts is based on the averments in Plaintiffs' Complaint and accepted as true only for the purposes of disposition of the instant Motion. (Rec. Doc. 1).

On April 16, 2005, Mr. and Mrs. Portis (collectively, "Plaintiffs"), an African-American couple, drove a vehicle packed with personal and household items from Akron, Ohio to Harrisburg, Pennsylvania with the intention of locating and renting an apartment for Mrs. Portis.  Mrs. Portis required an apartment in Harrisburg because she had recently been transferred from her federal employment in Ohio to a new job in Central Pennsylvania.

After seeing a print ad or listing in a free publication, Plaintiffs went to Korman Communities, an apartment complex located at 2311 North Front Street in Harrisburg, and spoke with the General Manager, Mary Thompson ("Ms. Thompson"), about leasing an apartment in the complex.  Plaintiffs were told that the terms of such a lease would not require any security deposit or other fees, but rather only payment of $585.00, the first month's rent.  Notably, these proposed terms were "part of frequently advertised rental terms for apartments at the Korman Communities, as this establishment frequently displays signs advertising this promotion," such as signs "promoting 'NO MOVE IN COSTS' . . . ."  (Rec. Doc.

1, ¶ 31, Exhs. A-E).  In their discussion, however, Ms. Thompson conditioned these terms as being "subject to approval of [Mrs. Portis'] rental application, which included a credit check."  Id. at ¶ 30.

Next, Plaintiffs walked through sample apartments, and apparently upon finding them to be satisfactory, Mrs. Portis "then agreed to immediately rent a studio apartment in the building that supposedly would be available to her."  Id. at ¶ 29.  Accordingly, Mrs. Portis completed and submitted her rental application, as well as two forms of photo identification – her Ohio driver's license and her federal employee identification card.

Ms. Thompson then left the couple "for the reported purpose of running a credit check" on Mrs. Portis.  Id. at ¶ 33.  However, when Ms. Thompson returned, she indicated that the credit check showed no credit history for Mrs. Portis and requested to run such a check on Mr. Portis, using identifying information such as his Social Security number.  Although Plaintiffs were frustrated by the situation because each of them "had an established credit history and previously had financed the purchases of their homes, vehicles and other personal property during their marriage," id. at ¶ 26, they provided Ms. Thompson the additional information on Mr. Portis in an attempt to finalize the rental process.

Again, Ms. Thompson left the couple with the reported purpose of running a

4

credit check, this time on Mr. Portis, and again, upon her return, Ms. Thompson advised Plaintiffs that the credit check showed no credit history.  Plaintiffs then demanded that Ms. Thompson re-run the credit checks because they insisted that they each had an established credit history.  Sometime later, Ms. Thompson claimed to have complied, ultimately advising Plaintiffs that she attempted to obtain a credit history on each Plaintiff twice, but that no such history was available for either of them.

As an alternative, Ms. Thompson suggested that Plaintiffs provide her with specific account numbers, credit card information, and other information about their various creditors.  However, Plaintiffs refused to provide such information.

Thus, under an alleged pretext that no credit history was available for either Plaintiff, Ms. Thompson advised Plaintiffs that Mrs. Portis would now be required to pay a $585.00 security deposit and a 40% non-refundable move-in fee (approximately $234.00) to secure a lease.  Feeling upset and as if they were being subjected to deliberate discrimination, Plaintiffs refused to agree to the changed terms of the rental agreement.

Plaintiffs immediately demanded a copy of the completed rental application forms, but Ms. Thompson refused to so provide.  Plaintiffs then demanded a letter confirming that Mrs. Portis attempted to lease an apartment, and Ms. Thompson

provided the letter.  <u>Id.</u> at Exh. F.  In said letter, Ms. Thompson claims to have attempted to obtain a credit history through a company named First American Registry, Inc.

In total, Plaintiffs spent more than three (3) hours at Korman Communities on April 16, 2005.  Upon their departure from the apartment complex, it was too late in the day to view other possible apartments to rent, so they drove back to Ohio with their vehicle still packed.

On April 23, 2005, Mrs. Portis completed a rental application and leased an apartment at Pennsylvania Place, located at 301 Market Street in Harrisburg.  Said lease required a $300.00 security deposit and a monthly rent of $690.00.  Notably, Pennsylvania Place also required a credit check of rental applicants, and via First American Registry, Inc., they were able to confirm that Mrs. Portis had good credit.

Later in spring of 2005, Plaintiffs contacted First American Registry, Inc., via telephone and thereafter in writing, to ascertain why their credit histories were not made available to Korman Communities on April 16, 2005.  First American Registry, Inc. represented that neither Ms. Thompson nor any other employee of Defendants requested such histories, and that the only requests for Plaintiffs' credit were made one week later by Pennsylvania Place.

**DISCUSSION:**

Plaintiffs' Complaint contains five (5) Counts, all of which appear to be asserted against all three (3) Defendants to this action.  Count I alleges violations of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, et seq.; Count II alleges violations of 43 U.S.C. § 1981 ("§ 1981"); Count III alleges violations of 43 U.S.C. § 1982 ("§ 1982"); Count IV alleges violations of the Equal Credit Opportunity Act ("ECOA"), 15 U.S.C. § 1691, et seq.; and Count V alleges violations of the Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 P.S. § 201-1, et seq.

The instant Motion (doc. 15) seeks dismissal of only Counts IV and V of the Complaint.  With respect to Count IV, Defendants argue that it fails to state a claim upon which relief may be granted because "the leasing of residential property does not constitute a credit transaction under ECOA."  (Rec. Doc. 16 at 5).  As to Count V, Defendants assert that it similarly fails because "Plaintiffs did not purchase or lease any goods or services from Defendants, which is a prerequisite to a claim under the [UTP]CPL."  Id. at 12.

In response, Plaintiffs contend that Counts IV and V should survive the instant Motion because they do not fail to state a claim.  Taking Count IV first, Plaintiffs appear to offer two (2) primary and related arguments: 1) "whether the

[ECOA] applies to residential leases is an issue of first impression" within the Third

Circuit (doc. 20 at 6 (emphasis omitted)); and 2) because the applicable standard of

review requires this Court to consider only the Complaint, too many questions

remain for this Court to dismiss the claim at this early juncture.  With respect to

Count V, Plaintiffs assert that "Defendants['] argument for a narrow, strict reading

of the UTPCPL is inconsistent with the required liberal application of this remedial

statute."  Id. at 10 (emphasis omitted).  More specifically, Plaintiffs argue that "[i]t

seems that Defendants wish the Court to add a little something to the statute that is

just not there: a requirement that a person liable under the Act must be the very

same person from whom the ultimate purchase or lease was made."  Id. at 14-15.

Taking the Counts at issue in sequence, we begin our analysis with Count IV.

We initially note that the text of the ECOA is the logical starting point in our

consideration of the viability of Count IV.  At its most fundamental level, the

ECOA provides:

> It shall be unlawful for any creditor to discriminate against any applicant, with
> respect to any aspect of a credit transaction –
> (1) on the basis of race, color, religion, national origin, sex or marital status,
> or age (provided the applicant has the capacity to contract);
> (2) because all or part of the applicant's income derives from any public
> assistance program; or
> (3) because the applicant has in good faith exercised any right under the
> Consumer Credit Protection Act.

15 U.S.C. § 1691(a).

Thus, the definitions of the terms "creditor" and "credit transaction" are integral to our inquiry.  As the parties aptly note, although the ECOA contains a definitions provision, "credit transaction" is not among the defined terms. However, "credit" and "creditor" are defined, and their definitions provide some insight: "credit" denotes "the right granted by a creditor to a debtor to defer payment of debt or to incur debts and defer its [sic] payment or to purchase property or services and defer payment therefor;" "creditor" refers to "any person who regularly extends, renews, or continues credit; any person who regularly arranges for the extension, renewal, or continuation of credit; or any assignee of an original creditor who participates in the decision to extend, renew, or continue credit."  15 U.S.C. § 1691a(d)-(e).

As the parties appear to agree, to date, neither the Supreme Court nor the Court of Appeals for the Third Circuit appears to have had an occasion to consider application of the above text to residential leases.  (See Rec. Docs. 16 at 6; 20 at 6).  Thus, the parties rely on persuasive authorities to support their respective positions as to the ECOA's application here.[3]

---

[3] We appreciate such citations and will discuss our views of them below.

However, because this issue is one of first impression in this Circuit, we note that Congress's findings and statement of the ECOA's purpose also provide guidance as to resolution of the Motion.  Said statement provides:

> The Congress finds that there is a need to insure that the various financial institutions and other firms engaged in the extensions of credit exercise their responsibility to make credit available with fairness, impartiality, and without discrimination on the basis of sex or marital status.  Economic stabilization would be enhanced and competition among the various financial institutions and other firms engaged in the extension of credit would be strengthened by an absence of discrimination on the basis of sex or marital status, as well as by the informed use of credit which Congress has heretofore sought to promote.  It is the purpose of this Act to require that financial institutions and other firms engaged in the extension of credit make that credit equally available to all creditworthy customers without regard to sex or marital status.

Act Oct. 28, 1974, P.L. 93-495, Title V, § 502, 88 Stat. 1521.

Cognizant of the relevant text of the ECOA and Congress's statement, we turn to consideration of the case law addressing whether the ECOA applies to residential leases.  Upon our review of the persuasive authorities cited by the parties on this point, we agree with the Seventh Circuit's view that the ECOA does not apply to "typical" residential leases.  See Laramore v. Ritchie Realty Mgmt. Co., 397 F.3d 544, 547 (7th Cir. 2005).  Moreover, based upon the averments contained in Plaintiffs' Complaint, we see no reason to find that the lease which Plaintiffs sought was sufficiently extraordinary to render it within the ECOA.

We agree with <u>Laramore's</u> holding for several reasons.  First, logically and structurally, it does not appear to us that this statute, which was "enacted to protect consumers from discrimination by <u>financial institutions</u>," <u>Midlantic National Bank v. Hansen</u>, 48 F.3d 693, 699 (3d Cir. 1995) (emphasis added), was intended to be used to prohibit discrimination by <u>landlords</u>.  We so conclude because we find sound <u>Laramore's</u> reasoning that "[t]he typical residential lease involves a <u>contemporaneous</u> exchange of consideration – the tenant pays rent to the landlord on the first of each month for the right to continue to occupy the premises for the coming month."  397 F.3d at 547 (emphasis added).  Thus, generally speaking, residential leases are not credit transactions and landlords are not creditors under the ECOA.

Second, we agree with <u>Laramore's</u> acknowledgment of a regulation promulgated by the Board of Governors of the Federal Reserve Systems after the Ninth Circuit's decision in <u>Brothers v. First Leasing</u>, 724 F.2d 789 (9th Cir. 1984).  Therein, the Board, empowered under the ECOA to "prescribe regulations to carry out the purposes of this title,"15 U.S.C. § 1691b(a)(1), indicated "'that the Ninth Circuit interpreted the ECOA's definition of credit too broadly when it concluded

in the <u>Brothers</u> case that the granting of a lease is an extension of credit.'"[4]

<u>Laramore</u>, 397 F.3d at 548 (quoting 50 Fed. Reg. 48,018, 48,020).  Such guidance

from a body empowered to provided it by the ECOA is, at a minimum, persuasive.

Third, we find that given the availability, and indeed invocation of, the FHA

by Plaintiffs, any application of the ECOA to the instant circumstances would be

duplicative and superfluous.[5]  Particularly where Plaintiffs have pled another

potentially viable ground for relief, we see no reason to adopt Plaintiffs' tortured

interpretation of the ECOA.

Additionally, contrary to Plaintiffs' argument, we find <u>Laramore</u> applicable to

the instant circumstances given the averments in Plaintiffs' Complaint, our sole

source of information regarding said circumstances at this time.  Specifically, the

Complaint repeatedly alleges that Plaintiffs merely sought to rent an apartment.

(<u>See</u> Rec. Doc. 1, ¶¶ 25, 27, 29, 36, 46, 65).  We see no suggestion in Plaintiffs'

Complaint that they sought a lease containing any extraordinary terms or conditions

that could render the lease a credit transaction under the ECOA.  Finally, although

---

[4] Even assuming <u>arguendo</u> that reliance upon the regulation is unwarranted, <u>Brothers</u> is distinguishable from the instant action.  <u>Brothers</u> is distinguishable because it considered the lease of an automobile, which is a "consumer lease" under the Consumer Leasing Act, 15 U.S.C. § 1667(1), as it involved the lease of a personal property.  In contrast, the instant action involves a lease of real property.

[5] As a matter of course, we express no opinion on the ultimate viability of Plaintiffs' FHA claim.

12

Plaintiffs' briefing on the instant Motion argues that Plaintiffs' submission of <u>credit</u> <u>applications</u> brings this action within the ECOA, the Complaint itself references instead "<u>credit check[s]</u>," <u>id.</u> at ¶ 30 (emphasis added), and "<u>rental application[s]</u>," <u>id.</u> at ¶¶ 30, 32, 45 (emphasis added).  In sum, we see no language in Plaintiffs' Complaint, and, indeed, under the circumstances that appear to be present here, we can imagine none, which would lead us to consider the possibility that some sort of credit transaction either did or could have occurred.

Accordingly, we will dismiss Count IV of the Complaint.

Turning, then, to Count V, we begin our analysis once again with the text of the statute at issue, the UTPCPL.  The UTPCPL prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ."  73 P.S. § 201-3.  Should such unsavory practices be employed, the UTPCPL permits certain private and public actors to bring suit.  <u>See</u> 73 P.S. §§ 201-9.2(a), 201-4.  Specifically, private actions may be filed by "[a]ny person <u>who</u> <u>purchases or leases goods or services</u> primarily for personal, family or household purposes <u>and thereby suffers any ascertainable loss of money or property</u>, as a result of the use or employment by any person of a method, act or practice declared unlawful by this act . . . ," 73 P.S. § 201-9.2(a) (emphasis added), and the Attorney General or a District Attorney may bring an action when he or she "has

13

reason to believe that any person is using or is about to use any method, act or practice declared by . . . this act to be unlawful, and that proceedings would be in the public interest . . . ."  73 P.S. § 201-4.

As the parties recognize, the UTPCPL clearly permits private actors to bring suit only when they purchase or lease goods or services.  Although it is well-established that the UTPCPL applies to residential leases, <u>see</u>, <u>e.g.</u>, <u>Commonwealth v. Monumental Properties, Inc.</u>, 329 A.2d 812, 820 (Pa. 1974), the issue in this case is whether the UTPCPL permits a person who leased property from one entity to bring suit against another entity from which the person initially attempted to lease property.  This is an issue of first impression in Pennsylvania courts, and thus, this Court must attempt to predict how the Pennsylvania Supreme Court would resolve it.  <u>See</u> <u>Gares v. Willingboro Township</u>, 90 F.3d 720, 725 (3d Cir. 1996) (indicating that in the absence of relevant state case law, federal courts are to predict how the state's highest court would rule).

Following our thorough review of the UTPCPL's provisions, as well as the persuasive authorities interpreting them, we conclude that the UTPCPL does not permit Plaintiffs to sue Defendants under the instant circumstances.  We so conclude for several reasons.  First, although we recognize that the Pennsylvania Supreme Court characterized portions of the UTPCPL's text as "expansive," and

noted that in accordance with legislative intent, they should be liberally construed, in reaching its determination that the UTPCPL applies to residential leases, <u>see</u> <u>Monumental Properties, Inc.</u>, 329 A.2d at 817, we find unpersuasive Plaintiffs' argument that liberal construction requires the outcome that they advocate.

Indeed, our review of the relevant statutory provisions leads us to conclude that adoption of Plaintiffs' position would require us not to liberally construe the statute, but to ignore its text.  As noted above, when "[u]nfair methods of competition and unfair or deceptive acts or practices [are employed] in the conduct of any trade or commerce . . . ," 73 P.S. § 201-3, the UTPCPL permits a "person who purchases or leases goods or services . . . <u>and thereby</u> suffers any ascertainable loss of money or property . . . ," 73 P.S. § 201-9.2(a) (emphasis added), to file suit.  Under the instant circumstances, we are in agreement with Defendants that "Plaintiffs did not suffer any loss as a result of their lease with Pennsylvania Place," and, thus, "Plaintiffs are confusing the cause of their loss with the measure of their damages," if any.[6]  (Rec. Doc. 24 at 6).

Second, we find telling the Pennsylvania legislature's inclusion of a provision enabling the Attorney General or a District Attorney to file suit.  Indeed, the presence of 73 P.S. § 201-4 appears to acknowledge a recognition by the

---

[6] To reiterate, we express no opinion on the viability of Plaintiffs' remaining causes of action.

15

legislature that circumstances may exist in which private actors are not permitted to bring suit under the UTPCPL.  Further, the fact that a public actor may bring suit ensures that the UTPCPL's purpose can be realized even in those circumstances in which private actors can not file suit.

Finally, we note that although we appreciate the abundant persuasive authorities cited by Plaintiffs on this issue, we find them inapposite here.  For example, in <u>Valley Forge Towers South Condominium v. Ron-Ike Foam Insulators, Inc.</u>, 574 A.2d 641 (Pa. Super. Ct. 1990), the court permitted a UTPCPL claim by a condominium association to continue against a manufacturer of roofing materials because although the association had not contracted directly with the manufacturer, it had suffered losses as a result of contracting with the installer of the roofing materials and said contract provided for warranties on the roof by both companies. Thus, although <u>Valley Forge</u> may stand for the proposition that direct privity is not required under the UTPCPL, it does not stand for the proposition that a UTPCPL claim can stand against "a wholly unrelated party or one who is foreign to the purchase or lease transaction" (doc. 24 at 10) because in <u>Valley Forge</u>, the UTPCPL's causation requirement was satisfied.

Accordingly, we will also dismiss Count V of the Complaint.[7]

**NOW, THEREFORE, IT IS ORDERED THAT**:

1.     Defendants' Motion to Dismiss Counts IV and V of the Complaint

      (doc. 15) is hereby **GRANTED**.

2.     Counts IV and V of the Complaint (doc. 1) are hereby **DISMISSED**.


                    <u>s/ John E. Jones III</u>
                    John E. Jones III
                    United States District Judge

---

[7] We note again that adoption of Plaintiffs' strained interpretation of the statute at issue is particularly unpalatable where, as here, Plaintiffs' FHA claim has not been challenged in the instant Motion.