IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| BERNICE PORTIS and JOHN PORTIS | : | |
| | : | |
| Plaintiffs, | : | No.  06-cv-2123 |
| | : | |
| v. | : | |
| | : | |
| RIVER HOUSE ASSOCIATES, L.P., | : | |
| a limited partnership, d/b/a KORMAN | : | |
| COMMUNITIES, INC., and KORMAN | : | |
| COMMUNITIES; WEST RITTENHOUSE | : | |
| MANAGEMENT CO., L.L.C., d/b/a | : | |
| KORMAN COMMUNITIES INC., and | : | |
| KORMAN COMMUNITIES; and MARY | : | |
| THOMPSON, individually and as an | : | Judge John E. Jones III |
| authorized agent and General Manager of | : | |
| KORMAN COMMUNITIES, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM

## September 30, 2008

## THE BACKGROUND OF THIS MEMORANDUM IS AS FOLLOWS:

Pending before this Court is a Motion for Summary Judgment (the

"Motion") filed by River House Associates, L.P. ("River House"), West

Rittenhouse Management Co., L.L.C. ("Rittenhouse"), and Mary Thompson

("Thompson") (collectively, "the Defendants") on June 13, 2008. (Rec. Doc. 54).

For the reasons that follow, the Motion will be granted in its entirety.

## PROCEDURAL HISTORY

On October 30, 2006, Bernice and John Portis (the "Portises" or "Plaintiffs") commenced the above captioned action by filing a five count complaint (Rec. Doc. 1) against the Defendants.  On April 13, 2007, the Defendants lodged a Motion to Dismiss Counts IV and V pursuant to Fed. R. Civ. P. 12(b)(6). (Rec. Doc. 15). Through our Order of August 2, 2007 we granted that motion. (Rec. Doc. 28).  On June 13, 2008, the Defendants filed the instant Motion with respect to Counts I, II, and III. (Rec. Doc. 54). Having been fully briefed by the parties, it is now ripe for our disposition. (See Rec. Docs. 54-56, 62-65).

## STANDARD OF REVIEW:

Summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see also Turner v. Schering-Plough Corp., 901 F.2d 335, 340 (3d Cir. 1990).  The party moving for summary judgment bears the burden of showing "there is no genuine issue for trial."  Young v. Quinlan, 960 F.2d 351, 357 (3d Cir. 1992).  Summary judgment should not be granted when there is a disagreement about the facts or the proper inferences that a fact finder could draw from them. See Peterson v. Lehigh Valley Dist. Council, 676 F.2d 81, 84 (3d Cir. 1982).

Initially, the moving party has the burden of demonstrating the absence of a

genuine issue of material fact.  See Celotex Corporation v. Catrett, 477 U.S. 317, 323 (1986).  This may be met by the moving party pointing out to the court that there is an absence of evidence to support an essential element as to which the non-moving party will bear the burden of proof at trial.  See id. at 325.

Rule 56 provides that, where such a motion is made and properly supported, the non-moving party must then show by affidavits, pleadings, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue for trial.  See Fed. R. Civ. P. 56(e).  The United States Supreme Court has commented that this requirement is tantamount to the non-moving party making a sufficient showing as to the essential elements of their case that a reasonable jury could find in its favor.  See Celotex, 477 U.S. at 322-23 (1986).

It is important to note that "the non-moving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact."  Pastore v. Bell Tel. Co. of Pa., 24 F.3d 508, 511 (3d Cir. 1994) (citation omitted).  However, all inferences "should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992) (citations omitted).

Still, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "As to materiality, the substantive law will identify which facts are material." Id. at 248.  A dispute is considered to be genuine only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving  party." Id.

**STATEMENT OF MATERIAL FACTS:**

As required by the aforesaid standard of review, our factual recitation herein is based upon our viewing of the evidence, and drawing of all inferences, in the light most favorable to the non-moving party, the Plaintiffs.

On April 16, 2005, the Plaintiffs toured a Harrisburg property known as the "River House," which was operated as part of the "Korman Communities." (Rec. Docs. 1 ¶ 19,  29 ¶ 19).  During this visit, Mary Thompson acted as an authorized agent and General Manager of the River House and acted on behalf of Rittenhouse Associates and West Rittenhouse Management. (Id.).  After touring the River House complex, the Plaintiffs returned to the rental office and met with Thompson to begin the rental process. (Rec. Doc. 56-17).  Plaintiffs were provided Korman's standard Application for Residency (the "Application"), which was the sole

application used by Korman at the relevant time, (Rec. Docs. 56-20, 56-21, 56-22),[1] and Bernice Portis completed the Application.[2] (Rec. Doc. 56-22).

Subsequent to the completion of the Application, Thompson ostensibly attempted to perform a credit check on Bernice Portis through Korman's vendor, First American Registry ("First American"). (Rec. Doc. 56-27).  After supposedly making multiple attempts, Defendant Thompson informed the Portises that she could not locate either of them in First American's system. (Bernice Portis Dep. 30:14-24, Feb. 19, 2008).  Thompson proceeded to request Mrs. Portis' credit card information, which the Plaintiff refused to provide. (B. Portis Dep. 34:1-6).  At this point, Plaintiffs aver that Thompson changed the terms of the contemplated lease agreement.  Specifically, Plaintiffs had been under the impression, based on

---

[1] Defendants assert that they did not use a different Application with the Plaintiffs than they used with other applicants in April 2005.  Plaintiffs deny the validity of this assertion but provide no basis for doubting it other than their generalized claim that the credibility of the Defendants' representations regarding their handling the matter is in question.

[2] Under the section styled "Disclosures and Agreements Concerning the Application," the Application provides,

> In compliance with the Fair Credit Reporting Act, you are hereby informed that an investigative consumer report may be made as to your character, general reputation, personal characteristics, and mode of living. Additional information will be obtained through employers, landlords, banks and financial companies, tax returns, credit reporting, agencies, or similar sources. By signing this application, you are authorizing the release of this information to the landlord or its agents.

(Rec. Doc. 56-22).  Bernice Portis read and understood this language prior to completing the Application. (Bernice Portis Dep. 33:11-14, Feb. 19, 2008).

advertisements and information provided to them by Thompson, that the rent for the apartment at which they were looking would not include a security deposit or other move-in fees. (John Portis II Dep. 23:1-18 Feb. 19, 2008; B. Portis Dep. 47:6-8).[3]  However, after failing to locate the Portises' credit report and being refused Mrs. Portis' credit card, Thompson informed the Portises that they would be required to pay a 40% non-refundable move-in fee. (J. Portis Dep.. 24:19-24; B. Portis Dep. 47:6-17).  The Portises found this repugnant and decided that they no longer desired to rent at River House. At the demand of John Portis, Thompson provided a letter, which indicated that she had unsuccessfully attempted to get a credit history through First American. (B. Portis Dep. 45:24-25, 46:1-5).  After receiving the letter, the Plaintiffs left River House without renting an apartment.

The next Saturday, April 23, 2005, Bernice Portis was able to rent an apartment at Pennsylvania Place, another apartment complex in Harrisburg. (B. Portis Dep. 60:13-19).  Pennsylvania Place also required a credit check of applicants and, using First American, (See Rec. Doc. 64-10), their sales associates

---

[3] Defendants controvert the assertion that this offer was in existence at the time the Plaintiffs contacted them on April 16, 2005.  Specifically, they claim that such a promotion was not instituted until August of 2006. (Rec. Doc. 56-55, 56-56, 56-57, 56-59).  While this potentially creates an issue of fact, it is immaterial to our determination because, as we state below, similarly situated tenants who signed their leases in April of 2005 received the same offer as Plaintiffs. Moreover, even if such a promotion existed on April 16, 2005, Plaintiffs would not have qualified for it because in light of Mary Thompson's inability to access their credit history.

were able to promptly check and confirm that Bernice Portis had good credit, (See B. Portis Dep. 60:13-19).  Bernice Portis rented an apartment at Pennsylvania Place at a rate of $690 per month, in addition to a $300 security deposit. (Id.).  After the success of Pennsylvania Place in running a credit report, the Portises contacted First American to inquire why River House could not run a credit report on April 16, 2005.  They discovered information which they claim supports their assertion that Thompson did not run a credit report on either of them on April 16, 2005. (Rec. Doc. 64-10).[4]  The Plaintiffs assert that Thompson's actions on April 16, 2005 had a racially discriminatory motive.  (See Rec. Doc. 1).  Defendants deny this averment and counter with the explanation that Thompson's conduct was not racially motivated; rather, it was underpinned by the fact that she did not know how to properly procure a credit history using First American because she was unfamiliar with that particular registry. (Rec. Doc. 56 ¶ 59-60).

## DISCUSSION:

As Defendants' Motion requests summary judgment in their favor as to the

---

[4] In response to their Consumer Disclosure Request, John and Bernice Portis were informed that their inquiry could not be processed because the information they provided did not match the information supplied by Thompson.  (Rec. Doc. 64-10).  In response to Plaintiffs' assertion that these facts support their averment that Thompson never ran a credit report on either of them, Defendants offer as evidence a document that purports to show that they were charged $10.70 per attempt ($32.10 total) by First American for processing Plaintiffs' credit histories. (Rec. Doc.56-51).

remaining counts of the Plaintiff's Complaint, we briefly review these claims.

Count I alleges a violation of the Fair Housing Act ("FHA"), 42 U.S.C. § 3601, <u>et</u>

<u>seq.</u>  Count II lodges a claim sounding in 42 U.S.C. § 1981 ("§ 1981"), and Count

III asserts a violation of 42 U.S.C. § 1982 ("§ 1982").  We will address each of

these counts sequentially.

**A.**    **Count I: Violation of the FHA**

The FHA, in relevant part, makes it unlawful "[t]o refuse to sell or rent after

the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or

otherwise make unavailable or deny, a dwelling to any person because of race,

color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a) (2007).

The FHA also makes it unlawful to "discriminate against any person in the terms,

conditions, or privileges or . . . rental of a dwelling . . . because of race." <u>Id.</u> §

3604(b).  Both parties agree that in resolving a claim under the FHA, the proper

analytical schema is provided by <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S.

792 (1973).  The <u>McDonnell Douglas</u> Court adopted a three step burden shifting

scheme to resolve discrimination cases in the absence of direct evidence.  The first

step requires the Plaintiff to establish a prima facie case of discriminatory intent.

<u>Keller v. Orix Credit Alliance, Inc.</u>, 130 F.3d 1101, 1108 (3d Cir. 1997) (applying

the <u>McDonnell Douglas</u> Test to age discrimination).[5]  The second step requires that the Defendant "produce evidence that is sufficient to support a finding that it had a legitimate, nondiscriminatory reason for the discharge."  <u>Id.</u>  If the Defendant cannot carry its burden of production, judgment must be entered for the plaintiff. <u>Id.</u>  If the Defendant carries its burden of production, the court proceeds to the third step, which requires the Plaintiff to produce evidence from which "a fact finder could reasonably either (I) disbelieve the employer's articulated legitimate reasons; or (ii) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." <u>Id.</u>

We begin by analyzing the four factors set forth in <u>Koorn</u> with the intent of determining whether Plaintiffs have established a prima facie case of discrimination. The Defendants do not contest the first or fourth factors, and so we will deem them satisfied.  Our discussion of the <u>Koorn</u> factors will therefore focus on the second and third factors.

Regarding the second factor, the Defendants to do not contest the assertion that the Plaintiffs applied to rent an apartment from River House but rather, they

---

[5] The Third Circuit has held that, in relation to claims brought under the FHA, a prima facie case "consists of proof that (1) plaintiffs are in a protected class, (2) they applied for and were qualified to rent or purchase housing, (3) they were rejected, and (4) the housing opportunity remained available." <u>Koorn v. Lacey Twp.</u>, 78 Fed. Appx. 199, 207 (3d Cir. 2003) (citing <u>Robinson v. 12 Lofts Realty, Inc.</u>, 610 F.2d 1032 (2d Cir. 1979)).

assert that Plaintiff's failure to complete the application process prevented Defendants from ever judging whether the Plaintiffs were qualified.  While that assertion may be true, it is inapposite in our determination.  At the prima facie stage of the McDonnell Douglas Test, Koorn requires that the Plaintiffs were qualified to rent, not that the Defendants themselves knew that the Plaintiffs were qualified.  Thus, even assuming, *arguendo*, that the Defendants in fact did not *know* that the Plaintiffs were qualified, the Plaintiffs may still satisfy the second Koorn factor by adducing evidence that they *were in fact* qualified.  The fact that Plaintiffs were able to rent an apartment at a comparable apartment complex in Harrisburg, Pennsylvania Place, a week after visiting River House is instructive.  Indeed, Pennsylvania Place and River House even used the identical company to retrieve credit histories.  In light of this, we believe that the Plaintiffs in fact were qualified to rent an apartment from Mary Thompson at the River House on April 16, 2005 and thus have satisfied the second Koorn factor.

With regard to the third factor, the Defendants argue that the Plaintiffs were not rejected; rather, they assert that it was the Plaintiffs who elected not to consummate the transaction.  Again, while this is technically true, we note that the FHA makes unlawful the discrimination against any person in the terms, conditions, or privileges of rental of a dwelling. 42 U.S.C. § 3604(b).  Plaintiffs

have adduced evidence that River House was running a promotional rate at the

time they attempted to rent in that complex and that they were denied that rate.

Thus, in the most literal sense, their attempt to take advantage of the promotional

rate was rejected.  Such rejection satisfies the third <u>Koorn</u> factor.  Therefore, it is

our considered view that the Plaintiffs have satisfied all of the <u>Koorn</u> factors,

meaning that they have carried their burden under <u>McDonnell Douglas</u> of

establishing a prima facie case of discrimination.  The burden then shifts to the

Defendants, requiring that they articulate a legitimate, nondiscriminatory reason

for their conduct.

 In this vein, we note that

> The defendant[s'] burden is merely to articulate through some proof a
> facially nondiscriminatory reason for the [decision]; the defendant does
> not at this stage of the proceedings need to litigate the merits of the
> reasoning, nor does it need to prove that the reason relied upon was bona
> fide, nor does it need to prove that the reasoning was applied in a
> nondiscriminatory fashion. However, the proffered reason for the action
> taken against the [plaintiff] must be reasonably specific and clear.

 <u>Reynolds v. Quarter Circle Ranch, Inc.</u>, 280 F. Supp. 2d 1235, 1245 (D.

Colo.2003) (citing <u>E.E.O.C. v. Flasher Co., Inc.</u>, 986 1312, 1316 (10th Cir. 1992)).

With this in mind, we are cognizant that the Defendants have adduced evidence

from which a reasonable jury could infer that their conduct was not motivated by a

discriminatory intent.  Specifically, Defendants note that Thompson was not fully

versed in using First American to run credit reports.  Therefore, she was unaware that she needed to click the "View Back Up Data Button" on the credit processing screen in order to view Plaintiffs' credit histories.  Thus, Defendants assert that there was no discriminatory intent underlying their actions of April 16, 2005; rather, they claim that the inability to process a credit check on Plaintiffs, and the subsequent imposition of a security deposit or move-in cost, was the product of Mary Thompson's unfamiliarity with the vendor protocols of First American Registry.  Additionally, Defendants assert that the Portises were not provided the promotional rate because that promotion was not in existence at the time of their visit. (See Matthew Ploude Aff. ¶ 4-5).  Defendants have also provided evidence indicating that the terms of the potential Portis' rental were the same as those offered to similarly situated non-corporate individuals during April of 2005.[6] (Id.).

We believe that this evidence is more than sufficient in carrying Defendants' burden of providing us with a legitimate nondiscriminatory reason for their conduct.  Therefore, we believe that the second prong of the McDonnell Douglas Test has been met.

The burden then shifts to Plaintiffs, who must adduce evidence from which a

---

[6] These terms included a nonrefundable move-in fee of 40% of the monthly rent, and may have included a security deposit, pending the applicant's creditworthiness. (Matthew Ploude Aff. ¶¶ 4-5).

reasonable fact finder could either (i) disbelieve the articulated legitimate reasons;[7]

or (ii) believe that an invidious discriminatory reason was more likely than not a

motivating or determinative cause of the questioned conduct.[8] Keller, 130 F.3d at

1108.  It is at this critical juncture that Plaintiffs' case fails.

Neither Plaintiffs nor Defendants contest the fact that Thompson printed out

the page containing the "View Back Up Data Button" on the day that the Portises

toured River House.  The Plaintiffs urge that this is probative of discriminatory

intent.  They posit that this page being printed is inconsistent with Defendants'

allegedly nondiscriminatory reason, which is that Thompson did not know she

needed to click the button in order to view the Portises credit history.  (Thompson

Dep. 82:1-22, 182:18-19).[9]  We do not believe that a reasonable jury could come to

---

[7] In interpreting this language, the Third Circuit Court of Appeals has said, "[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer . . . . Rather, the nonmoving plaintiff must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence."  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).

[8] Pursuant to this language, a plaintiff "must point to evidence that proves age discrimination in the same way that critical facts are generally proved-based solely on the natural probative force of the evidence." Keller, 130 F.3d at 1111.

[9] Indeed, when shown a printout of the page containing the "View Back Up Data Button," which was allegedly printed the day of the Portises' visit, Thompson stated that that button would have meant nothing to her at the time of the Portis visit because she did not know its function.

such a conclusion.  At most, the fact that this page was printed indicates that Mary Thompson was aware that the "View Back Up Data Button" existed.  It does not, however, indicate that she *knew* she needed to click the button in order to access the credit history of either Plaintiff.[10]  Therefore, we believe that a reasonable jury could not infer from this printed page that Defendants' legitimate, nondiscriminatory reason was actually a discriminatory pretext.

Additionally, the Plaintiffs note that, in response to their Consumer Disclosure Request, they were informed that their inquiry could not be processed because the information they provided did not match the information supplied by Thompson.  (Rec. Doc. 64-10).  They claim that this supports the proposition that, as a result of her racial animus, Mary Thompson  never checked their credit histories on the day in question.  However, when viewed in conjunction with Defendants' evidence that they were charged $32.10 for three inquiries run on the Portises, such a conclusion is not reasonable.  Even considering the Plaintiffs' claim in the light most favorable to them, a reasonable jury could not conclude that their own inability to process their Disclosure Request is indicative of Thompson's failure or inability to run a credit check on either of them.  At most, their inability

---

[10] In fact, Sarah DeHaas, an employee of River House at the time of the incident in question, also encountered trouble accessing credit histories through First American as a result of the "View Back-Up Data Button." (Sarah DeHaas Dep. 46:20-25, 47:1-9; 50: 24-25, 51:1-17, 52 23-25, 53, 1-7, 68 8-19).

to process the Disclosure Request indicates, as was stated in the vendor's response, that the information submitted by Thompson was at variance with the information submitted by Plaintiffs.  Thompson's error in submitting Plaintiffs' information on the day in question does not, by itself, shed doubt on Defendants' legitimate, nondiscriminatory reason for its conduct.[11]  Since Plaintiffs have adduced no further evidence relating to the mistyping of Plaintiffs' identification information, we find that a reasonable jury could not conclude that it makes Defendant's nondiscriminatory reason pretextual.

Finally, insofar as Plaintiffs assert that refusing to grant them the promotional rate provides the requisite pretext for satisfying the third prong of the McDonnell Douglas Test, we are likewise not persuaded.  Even assuming, *arguendo*, that the promotional rate was in effect at the time that the Portises toured River House, and further assuming, *arguendo*, that they were not offered this rate, those facts alone do not establish a racial pretext for Defendants' conduct.

---

[11] We note that Plaintiffs argue that Thompson's incorrect entering of their information three times is unreasonable and probative of discriminatory intent. We find this supposition unavailing, as it is certainly plausible that Thompson, who entered both of the Portises' social security numbers, inadvertently mistyped them three times.  We think that mistakes are bound to occur when dealing with the eight or nine digit identification numbers of two related individuals. In fact, it appears that Thompson entered Bernice Portis' social security number when she had John Portis' name entered on the submission form.  We think that neither such a mistake, nor the mistyping of information three times, indicates a discriminatory pretext sufficient to rebut Defendant's legitimate, nondiscriminatory reasons for its conduct.

Indeed, and as previously noted, Defendant has provided the Court with multiple pieces of evidence that indicate that the conditions placed upon the Portises' potential rental were identical to the conditions placed upon similarly situated individuals.[12] (Matthew Ploude Aff. ¶¶ 4-14).  The Plaintiffs have provided no evidence that would lead a reasonable jury to infer that they were offered terms different than similarly situated non-corporate applicants during April 2005.

In light of the above, it is our reasoned view that Plaintiffs' have not succeeded in adducing evidence that would cast doubt upon the Defendants' legitimate, nondiscriminatory motive.[13]  Since they have failed to satisfy the McDonnell Douglas Test, we will grant the instant motion with regard to Count I of the complaint.

**B.**   **Counts II & III: Violations of § 1981 and § 1982**

§ 1981 provides, in relevant part,

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties,

---

[12] It is of import to note that the "similarly situated" phrase applies to non-corporate tenants who were similarly situated in terms of their credit history, not their race.

[13] To paraphrase William Shakespeare's Macbeth, Plaintiffs have constructed a case that is full fo sound and fury, but in the end signifies nothing, even as we cast it in a light most favorable to them.

16

taxes, licenses, and exactions of every kind, and to no other.

42 U.S.C. § 1981 (2007).  § 1982 provides, "All citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. §1982 (2007).

Where, as here, the same evidence provides the basis for claims under the FHA and under §§ 1981 and 1982 (collectively, the "civil rights statutes"), the three part burden shifting test articulated by <u>McDonnell Douglas</u> is used in analyzing the § 1981 and § 1982 claims.  In establishing a prima facie case under the civil rights statutes, the Plaintiff must satisfy the same standard as that used in FHA cases, namely the four prong approach articulated in <u>Koorn</u>.  Thus, in the present case, since the same evidence provides the basis for the FHA and the civil rights statutes, the exact same analysis is used in resolving both sets of claims.  Since it is our conclusion that the Plaintiffs have failed to carry their burden under the <u>McDonnell Douglas</u> Test with respect to their FHA claims, their claims under the civil rights statutes must also fail.  We will therefore grant summary judgment with respect to the civil rights claims contained in Counts II and III of the

Complaint.[14]

An appropriate order will enter.

---

[14] We note that the Defendants have asked us to disregard the Affidavits of Bernice Portis and her counsel under the Shame Affidavit Doctrine.  (See Def.'s Reply. Br. 6-8) (citing Balgrave v. Nutrition Magmt. Servs. Co., 2008 U.S. Dist. Lexis 52404, *10 (E.D. Pa. 2008) (citing Jiminez v. All. Am. Rathskeller, Inc., 503 F.3d 247, 253 (3d. Cir. 2007))).  We find the affidavits superfluous to our present determination.  Since we have not utilized them in reaching our determination, we see no need to formally exclude them.